Good morning, Your Honors. Susan Alexander on behalf of Israel Shurkin and the Plaintiff Class of Investors. With me at council table is Dennis Herman. I'd like to reserve three minutes for rebuttal. Your Honors, what's critical here is the context. This is a seller's case, which until 20 minutes ago I would have told you was unusual, but it seems to be more of the norm today. The context here is that defendants are a small wine company with fewer than 225 employees, and the plaintiff's office is a small wine company with fewer than 200 employees. And the three men who ran it, they wanted to take their company private, they were short on cash, and so their goal was to deflate the stock price. They did it in two ways. They issued two false statements. In December, they issued a false fairness opinion that was out of date, which concealed the dramatic second-quarter results that they had had, about which they knew. And second, on January 20th, when a bidding war for this company broke out, even though for three years they had searched for any interest in buying this company, either from someone internally or anyone externally, and had found none, a bidding war had broken out, and on January 20th they concealed that fact. By concealing those two facts, the second-quarter gangbuster results and the bidding war, they were able to deflate the stock prices to the lowest possible $0.03 range. To our extent, did the December statement have any continuing bearing in view of the January statement? It's part of a contiguous scheme to deflate the stock price. And because defendants knew both things, they knew about the dramatic second-quarter results and they knew about the bidding war, defendants knew to hang on to their stock as the truth slowly leaked out and the stock re-achieved its true value at $8.25 on April 23rd. So defendants were able to cash out for $8.25. In fact, they were even able to cash out their unvested options. Your January statement is the January 20th press release? Yes. Is that right? And this is the one where they announce that they're suspending the purchase price? The first merger, yes. Why wasn't that sufficient notice that something was going on if they're suspending the purchase? Well, it's interesting, because when they say that they're suspending it, perhaps it's a partial revelation of the dramatic second-quarter results, which had been so much more profitable, 250 percent more profitable than they expected. But the fact that they were able to cash out their uninvested options, they knew that in December. They knew that on December 23rd when they issued the false fairness opinion. What had changed between December 23rd and January 20th is that a bidding war had erupted. And that was new information. And here's why. They had told, repeatedly told investors that there was no interest in buying this company. In fact, in the December 23rd... They said they were, yes. What else were they required to say? They were required to say that there was a bidding war involving an insider of the company and a major player in the wine industry. And the reason we know that is because of BASIC. So the Supreme Court says that in looking at what's important to reveal regarding merger explanations, merger discussions, number one, it's a fact question. And number two, so really shouldn't properly be resolved at the pleading stage in any event. And number two, it depends on the level of interest, the indicia of interest at the highest corporate levels. In other words, how seriously were the really, the high corporate officers taking these merger discussions? Well, in this case, they were taking them very seriously. The CEO himself was bidding for the company. Under BASIC, there's absolutely no question this was material information. And their statement that they were suspending the reverse merger because of improved business and market conditions could possibly be read as a partial disclosure of the second quarter results. But it certainly does not reveal anything about a bidding war for the company, particularly in light of the fact that they had told investors, we've been looking for a buyer for three years. So they said that while the company has reasonably investigated all inquiries and discussions, they have never over a three-year period, they have never resulted in a firm offer or proposal from any third party or entity, the board has concluded that a third party merger or acquisition is not a realistic means of achieving stockholder liquidity in the near term. That's the context in which they went to the market on January 20th and said, we're suspending because of improved market and business conditions. But the reality that they knew is between their most recent statement to the market on December 23rd and the press release on January 20th, this bidding war had erupted. On January 7th, the wine group, a major player in the wine industry, came in and said, we want to buy the wine company for $5 a share. This tells you, this goes to the falsity of the December 23rd statement that included a fairness opinion saying the company was worth $3.25 a share. And CEO O'Neill countered by saying, no, wait, I want to buy it for $5. And the board convened a special committee and they hired lawyers. I'm a little confused by your reference to BASIC. As I look at section Roman 3 of BASIC, it appears that the court says that merger negotiations because of the possibility the contemplated transaction will not be effectuated, fall into a category in which it is difficult to ascertain whether the reasonable investor would have considered the omitted information significant at that time. But I thought you said that BASIC squarely required this. That seems to me to be 180 degrees off. I'm looking at page 239 of BASIC, and I apologize, Your Honor, I don't have the case in front of me, so I can't reference the language that you're looking at. But at 239, the decision says that this is a fact, it depends on whether merger discussions in any particular case are material, therefore it depends on the facts. Generally, in order to assess the probability that the event will occur, the fact finder will need to look to indicia of interest in the transaction at the highest corporate levels. I read that to mean, are the officers of the company taking these bids seriously? And here, the officer of the company was one of the bidders. It's absolutely clear they were taking these bids seriously. It was material information, especially in light of all of the representations that had been made over a three-year period that no buyers were available inside or outside of this company. I'd like to talk about the December 23rd false statement in the proxy, in the proxy, if the Court's ready to move on. There are at least seven groups of allegations that make up the cogent theory, which explains how we know that defendants knew the fairness opinion was not accurate. First of all, the harvest happens at the same time every year, right? The second quarter of their fiscal year always is the financial determinant of their year. The second quarter makes or breaks them. They're a wine company, the grapes grow in the spring and the summer, they're harvested, the crush is in September, that's their business. Number two, the biggest portion of the second quarter is actually the very front part of it, it's a very front-loaded quarter. So their second quarter, because their fiscal year runs from July 1st to June 30th, their second quarter is actually October to December. So the bulk of their year happens in the second quarter, but the bulk of the business happens in the first month of the second quarter, immediately after the crush. That's true of their case goods, it's true of their bulk goods. And the other way that we know that is the majority of their sales are sold for holidays. Well, the thing about holiday sales is that they have to be made before the holidays, so the wine has to be sold to retailers to get on shelves, to be purchased, to get on tables. By Thanksgiving and Christmas and New Year's. So they have a front-loaded quarter. Defendants' timing, given that, given the fact that they know they've got a seasonal business, so, for example, Golden State Vendors in their brief at page 14 referred to their business as a seasonal business, they know this. So it is suspicious, at least, that they commissioned a fairness opinion to be prepared just before the second quarter, knowing that the proxy would be released eight days before the end of the second quarter. And is suspicious sufficient under the PSLRA? Suspicious is sufficient as one of the many scienter allegations to be considered holistically, Your Honor. So it's, as you were discussing before, it's something, it raises an eyebrow, and when put together with the other allegations, several of which I want to continue to tell you about, when looked at holistically, we know these defendants knew about their second quarter. They also knew, because not only was the second quarter always their financial, the financial cornerstone of the year, but this particular second quarter was remarkable. It was 250 percent better than what they had projected it to be. So, for example, so they had projected that they were going to make 1.7, their net was going to be 1.7 million. Their actual net was 4.3 million. Another way of looking at this. I'm still puzzled, counsel. Your lead plaintiff here, I believe, sold his stock after January 20th. Is that correct? Correct. Why would he sell it when they just issued a press release saying we're suspending the purchase because things are looking up? Your Honor, I don't have an answer to that. But the point is, in a seller's case, I don't know the reason that he sold. I think it was because the stock prices are the most of anybody in the class, right? Because the curve of a stock – I don't want to hit the microphone – the curve of a stock price chart is the inverse of what it looks like in a traditional securities fraud case. So the stock price was deflated by the false fairness opinion on December 23rd, deflated by the press release on January 20th. And as the stock – and so the stock price – deflated by the press release on January 20th that says that business is picking up? Because in comparison to what was actually happening, they were concealing the fact that there was a bidding war for the company. So the true value of the company was – Well, that's very different than – that's not saying – that's very different from saying that the stock value was depressed. We're saying that the stock value went down. No, I'm saying that it was deflated from its true value. So the true value, if the market had known – It just suspended the purchase. Now the stock value can go up in response to the press release and all the rumors that are out there. But it didn't rise to the point that it rose to once the market knew that the CEO – Right, but everybody was on notice that the market – that the market was – that there was – something was afoot. But they were not given full information. So it's not – it's one thing to say to the market, to the CEO, but it's one thing to partially – first of all, they weren't even fully given the information about the dramatic second quarter results. So they weren't given the extent of the improved market conditions. At what point could they find those out? On – the stock never really fully achieved – Well, at what point would the second quarter earnings be released? The second order – the second quarter earnings were released on February 18th. So two, three weeks later. Well, February 18th. No, that's – Of 2004. Correct. February – And those facts were not released in the second quarter 10-Q. In fact, they were not – there was no discussion of the competing bids in that – in that report. Shall I – I'd like to save the remaining minutes for the – Counsel, just for our benefit, because we've got – we're showing three names on the list. Do you have an arrangement as to how you're dividing time? Are you taking all the time, or – Good morning, Your Honors. No, I'm Mike Egan. I represent Golden State Vintners, and I'll be speaking on behalf of Defendants Kelleher and Brown also. My colleague, Mr. Dickey, here, will be speaking on behalf of Defendant O'Neill. Okay. And he will have three or four or five minutes when I'm finished. All right. So you're going to take approximately ten minutes. Ten or eleven, yes, Your Honor. Okay. I'd like to start with TELABS. TELABS examined the meaning of the word strong inference that Congress used, and TELABS held that a permissible inference is not enough, that a reasonable inference of fraud is not enough, but rather that the plaintiff must plead particularized facts, which give rise to a cogent and compelling inference of falsity and intent to deceive. So that is the standard by which we look at these facts in this complaint, cogent and compelling, or else plaintiff has not followed the PSL-1 rate. Let's first talk about, if we might, the January 20 press release. There was no bidding war as of January 20. There were no bids. There were no offers. And that's when Mr. Shurkin sold his shares, January 20 and January 21. Ultimately, there was what would be called a contest for corporate takeover or a bidding war. But as of January 7, the Wine Group had sent a letter, quote, expressing non-binding interest at a price to be determined. That's not a bid. That's not an offer. On January 9, Mr. O'Neill indicated to the Board that he, quote, intended to explore making a competing offer. Under these circumstances, Mr. Shurkin's attempt to plead damage arising out of the January 20 press release fails for at least three reasons. First, there's no duty. Second, the omission was not material and misleading. And third, there's absolutely no cogent and compelling fact that would show why these Board members would seek to depress stock when they were sellers also. First, with respect to duty, BASIC does not hold anything with respect to duty to disclose. BASIC's holding was limited to when merger negotiations are material. The law in this circuit is quite clear, as it is in other circuits. There is no duty to disclose merger negotiations. The Brody case holds that. Reese v. Pan American in the Second Circuit holds that. Phillips v. LCI International in the Fourth Circuit holds that. And perhaps the best indicia of the fact that there is no duty to disclose is a case that plaintiffs cited in its Rule 28J letter, SEC v. Talbot, a 2008 Ninth Circuit opinion. In that case, the issue was whether an insider who traded on confidential information regarding merger negotiations that were firm violated the insider trading laws. By definition, the Court recognized that neither company was disclosing to the market its merger negotiations. And that was never a problem in the case. So there is no duty to disclose merger negotiations. Next, the fact that the GSV did, in fact, issue a press release on January 20th saying that market and business conditions had improved. And that an investment banker had been hired was not rendered misleading by the omission to mention the preliminary expressions of interest. Brody holds this. Brody is right on point. In fact, Brody is a much stronger case. In Brody, at the time of the press release, the company was buying back shares from its shareholders at $9.25 a share. The company had in hand firm written offer from a potential acquirer of a share of Brody. The firm had in hand firm written offer at $11 a share. The company sent out a press release indicating the status of its buyback program and didn't mention the merge offer. The Ninth Circuit held that because that omission was not misleading and would not have been misleading unless the company had affirmatively denied that it was in negotiations. And since it didn't, it was not misleading, and that's certainly the case here, because the press release did not affirmatively deny that there were merger negotiations going on. Next, let's look holistically at the motive here in connection with the merger. The company had done the right thing. It set up a special committee with Mr. Brown, principal shareholder, on it. The special committee had retained an investment banker, and they had excluded Mr. O'Neill, a potential bidder, from negotiations. Now, these people knew basically that they were going to sell either to GSV or to Mr. O'Neill. Why would they do anything to depress the share value when they were going to be the sellers? Their interests were perfectly in line with every investor in the marketplace. Well, now, if earlier on they had tried to depress the value because they wanted to buy it themselves, there would be a motive to do it. Could that motive still be existing once ...? Well, I'm happy to talk about the fact that there was no motive earlier on and there was none of that, but the answer to your question is no. Once the share — once the — in the going private transaction, the company is a buyer of shares. Once that's taken off the table on January 20th, the company is a seller of shares, and the board members are sellers of shares. There is no economically rational inference that they would do anything to harm their ability to sell their shares, and certainly no cogent and compelling inference that they would do anything to harm their own economic self-being. Now, plaintiff argues that the press release is also misleading because it is indicating that the company is a seller of shares. It is inconsistent with prior statements that the company had made. Let's look at those prior statements in the proxy statement. The first one is the company has received no firm offers. That was true on December 23rd. It was true on January 20th. They had received no firm offers. Secondly, as of January 20th, the company had received preliminary expressions of interest. What did the proxy statement say about that on December 23rd? It said, since that time, 2000, the company had received some preliminary inquiries from third parties to merge with the company, including an inquiry and preliminary exchange of information in the late summer of 2003. That is not in any way inconsistent with the press release. In connection with the merger, there is just no clear and compelling case for fraud. I would like to talk about the December 23rd proxy statement, if I might. And there are many, many problems with their case there, one of which is the following. Their argument is that Mr. Shirk and the plaintiff were somehow defrauded by that pessimistic proxy statement. Let's see what happened. When the proxy statement came out on December 23rd, and it was too pessimistic in their view, did he sell? No. Did he buy? No. He held. The price on that day was $3.09. Mr. Shirk held all the way to January 20th. And then when the press release came out, he sold. And he sold at about $3.50 a share. The securities laws do not allow someone who holds in the face of a statement to recover. There was no causation there. By the time he sold, the good news had been in the market and the proxy statement had been taken off the table. And the proof is in the pudding. The market, no one in the market could have sold at above $3.25 because that was the price the company was going to buy the shares back. However, on January 20th, when the proxy statement, when the going private was taken off the market, the price closed at $3.50 and it continued going up throughout the period. So the only statement that Mr. Shirk could possibly recover for is a misstatement, a fraudulent misstatement in connection with the January 20th press release. And for the reasons we've set forth above, it just didn't happen. So let me just talk a minute about the tele-app's view of holistic view, because we embrace that in this case. We as defendants embrace that. In the spring of 2003, the company's stock was bumping along at $2 a share. There was very little value, excuse me, very little volume. Very few shareholders were trading in it. And being public was costing the company about a million dollars a year, which was a lot of money for that company. The board met, they looked at various things to do, and they decided, let's go out and buy back enough shares to take this company private and save a million dollars a year. And it turned out that was only 2% of the equity value of the shares that they needed to buy back. They set up a special committee. The special committee hired a special counsel. They hired an investment banker. The investment banker rendered a fairness opinion, and indeed, they agreed to pay the shareholders not $2 a share, but $3.50 a share, a 50% premium. The investment banker rendered a fairness opinion, and he did six different analyses, liquidation analyses, comparable sales analyses, and so forth. One of them was a discounted cash flow analysis. That's the only analysis in which the projections in the December 2003 proxy statement were used. However, that discounted cash flow analysis covered five years, 20 quarters. One quarter does not a company make, and it was clear that the investment banker said, we did six different analyses, none of them is controlling. They all support our fairness opinion of $3.25. And then what happened when things got better, holistically? What did the company do? It did the right thing. It took the $3.25 deal off the table and tried to get the shareholders more, and it did get the shareholders more. It got them $8.25. I'd like to talk about why it is that there is no basis to conclude that the insiders had guilty knowledge as of December 2003. Because the facts just don't support it. However, I'm going to give the rest of my time to Mr. Dickey, and again, I don't think there's any claim with respect to that December 23 proxy statement anyway, because Mr. Shurkin did not act on it until it was later taken off the table. Thank you very much. Thank you. And please, the Court, my name is Jonathan Dickey with Gibson, Dunn & Crutcher, and I represent Defendant Jeffrey O'Neill. And I'm going to pick up right where Mr. Egan left off on the question about the December proxy and the timing of knowledge that plaintiffs seek to have this Court draw plausible inferences from. And what I say about Mr. O'Neill I think goes as well for Mr. Egan's individual clients. There are no facts, Your Honors, pled in this complaint that demonstrate that my client, Mr. O'Neill, or for that matter other members of senior management, had direct knowledge of what plaintiffs' counsel have described as the gangbusters' quarter. And I would add as a footnote, that gangbusters' quarter on an earnings basis amounted to nothing more than $1.3 million on an annualized basis according to their own figures. So not quite a gangbusters' quarter on a net income basis. What is missing from this complaint? Because back to Tell Labs, Tell Labs instructs this Court that omissions and ambiguities count against any inference of scienter. So what's missing from this complaint? As it relates to my client, Mr. O'Neill, here's what's missing. There is no allegation from any confidential witness or otherwise that Mr. O'Neill was part of any effort to depress earnings, none. There are no allegations that Mr. O'Neill participated in any December quarter in manipulation of revenues or earnings. On the contrary, the record is quite clear that in that December quarter, the bulk wine business exceeded all of its revenues. It exceeded all expectations on the positive side. And if, in fact, the Machiavellian allegations of plaintiffs were true, Mr. O'Neill would have had every incentive to do everything possible to depress those earnings as well. But on the contrary, as CEO, he oversaw a very significant growth and trajectory in the bulk wine business on the positive side of the house. To Mr. Egan's point, stepping back and looking at this holistically, the record from December forward is of a management team led by Mr. O'Neill that grew the business, that grew revenues, and that added shareholder value from $3.50 a share to over $8 a share. What else is missing from this complaint? There's no allegation that Mr. O'Neill controlled the board. In fact, to the contrary, plaintiff's reply brief admits as much, that Mr. O'Neill did not control Mr. Brown, the chairman of the board, who himself represented majority ownership through SBIC. So from January 9th forward, the record is clear when the TWG offer was, or I should say, the indicator that Mr. O'Neill was controlling the board. The board's indication of interest was presented to the company, and Mr. O'Neill indicated that he might also bid for the company. Mr. O'Neill was walled off entirely from anything that followed. The record is clear that the board set up a special committee. Mr. O'Neill was not on it. The board hired independent counsel to evaluate this. Mr. O'Neill was not part of those discussions. Mr. O'Neill was not part of any of the disclosures that followed, or the negotiations either with TWG, or certainly in his capacity as a bidder, he was involved in those negotiations, but not otherwise. So I think the record is clear, and my time is just about up. It's gone. Yes. Thank you, Your Honor. Thank you. Your Honor, there are two recent decisions by this Court that I think are highly relevant, and they were noted in the 28-J letter that we submitted to the Court. In this Court's decision in Burson, Judge Kaczynski wrote for the Court, first of all, that Telabs did change the pleading standard, and that unlike didn't change the pleading standard, excuse me, changed this Court's interpretation of the pleading standard, and that unlike the Court's language in Gompers suggesting that equally plausible inferences might defeat Sienter, now ties go to the plaintiff. So where it's, where there's a tie, ties go to the plaintiff. We think that this case is stronger than that and survives under any standard. The other interesting thing that Burson says, though, is in situations where defendants do not have a duty to speak, do not have a duty to speak, once they speak, they have a duty to speak in a way that is not misleading. And that applies both to the false fairness opinion that was included in the December 23rd proxy, as well as to the false explanation for the January 20th. So while they may have given an explanation for suspending the reverse merger on January 20th, and perhaps it was even a somewhat positive explanation, it was not the full truth. It was misleading about the bidding war that had, in fact, emerged. And on the bidding war, this Court's recent decision in Talbot is instructive. It's in the context of summary judgment, but there, the Court held that where witnesses were prepared to testify that there was a merger, that the merger was just a rumor, not a factual statement, or that it was discussed, that no one really discussed when the acquisition would occur, or that one never knows for sure, but that's kind of what it looked like, those statements, those weak statements were sufficient, according to this Court, to create a question of fact as to materiality. The facts here are so much stronger. The CEO himself was engaged in a bidding war with a major industry player. Those facts are absolutely material. Basic's test is whether or not the corporate officers were interested. They were. They were bidding. It was absolutely material, and it needed to be disclosed. And I'm out of time. Thank you. We thank all counsel for the argument. Sherkin v. Golden State Vintners is submitted. And with that, the Court stands in recess until tomorrow. Thank you. Thank you.
judges: Beezer, Bybee, Roth